Concerning M.S., Mother, and C.S., Father, Petitioners,

v.

The PEOPLE of the State of Colorado, Respondent,

In the Interest of L.R.S., Child.

No. 90SC169.

Supreme Court of Colorado, En Banc.

June 3, 1991.

Calvin Lee, Glenwood Springs, for petitioners.

Kathleen H. Taylor, Craig, for respondent.

Polly St. James, Steamboat Springs, for amicus curiae Routt County Dept. of Social Services.

Justice LOHR delivered the Opinion of the Court.

In *People in the Interest of L.R.S. and Concerning M.S. and C.S.*, 791 P.2d 1215 (Colo.App.1990), the Colorado Court of Appeals affirmed an order of the Moffat County District Court directing the petitioners, M.S. and C.S., to reimburse the Moffat County Department of Social Services (Department) at the rate of $264.00 per month until the full cost incurred by the Department for residential placement of the petitioners' developmentally disabled child, L.R.S., is recovered. The court of appeals construed the statutes governing parental support obligations to require that the parents pay the entire cost of residential placement through monthly payments based on their financial ability even if this necessitates continuation of the payments after the placement is no longer in effect. We granted certiorari and now reverse.[1]

## I.

The petitioners, M.S. and C.S. (parents), have a developmentally disabled daughter, L.R.S. When L.R.S. was sixteen, school authorities recommended placing her in a residential facility equipped to provide suitable treatment for handicapped children. The parents had difficulties in finding as well as paying for suitable placement, so they approached the Department. After discussions with the Department, the parents voluntarily agreed to an adjudication of dependency and neglect pursuant to section 19–3–102(1)(e), 8B C.R.S. (1990 Supp.). After appropriate proceedings, the district court adjudicated L.R.S. dependent and neglected on May 26, 1988, and transferred legal custody to the Department. L.R.S. was referred to a community centered board to evaluate her eligibility for local programs for the developmentally disabled,[2] but she was ineligible because such programs did not accept persons under eighteen. The community centered board recommended that the Department place L.R.S. in residential care. The Department placed L.R.S. at the Roundup Fellowship facility in Colorado Springs.

As the parents could not afford the $2,152 monthly cost, the Department agreed to pay that placement cost, while the parents would pay the Department a monthly fee based upon the parents' financial ability. The monthly fee initially was set by the court at $221, and the parents were not responsible for the remaining $1,931 per month.[3] At the time L.R.S. was initially placed at Roundup Fellowship, the Department's policy required monthly contributions only for the duration of a child's placement. The parental contributions would cease upon the child's removal from residential placement, and the parents would have no obligation for that portion of the residential treatment costs that had not been covered by the parents' prior monthly payments.

The Department subsequently changed its policy to require parents to pay the total cost of residential placement even if this required continuation of payments following completion of the period of placement.[4]

---

1. The record before us is limited to the proceedings concerning the parental support obligations. We rely on apparently undisputed facts in the parties' briefs and representations made by counsel during oral argument for the background information set forth hereafter in this opinion.

2. § 19–3–506(1)(a), 8B C.R.S. (1990 Supp.), requires such a referral "[i]f it appears from the evidence presented at an adjudicatory hearing or otherwise that a child may have developmental disabilities." *Accord* § 19–3–507(2), 8B C.R.S. (1990 Supp.). *See* § 27–10.5–102(6), 11B

C.R.S. (1989), for the definition of community centered board.

3. L.R.S.'s social security benefits of $368 per month apply to the cost of placement.

4. The record does not disclose how other counties are treating parental support obligations, although in oral argument counsel for the parents represented that at least one other county continues to follow the policy of requiring only partial reimbursement based on the parents' financial ability and limited in time to the period of placement.

The Department sought a court order directing the parents to make payments in accordance with the new policy for costs incurred after January 1, 1989. On January 23, 1989, the Moffat County District Court ordered the parents to pay monthly installments of $264 [5] until the Department is completely reimbursed, but stayed the order to permit the parents to challenge its validity by further proceedings in district court. On February 22, 1989, after hearing oral argument, the district court determined that the Department's new policy was consistent with the applicable statutes, and reinstated its January 23 order.

Thereafter, the district court held a hearing to review L.R.S.'s placement. Since L.R.S. had attained the age of eighteen, the Department asked that she be transferred to a local community-based placement facility. The parents objected to this transfer because they believed, based on discussions with the Roundup Fellowship staff, that L.R.S. would regress if removed from that placement. After hearing testimony, the district court found that the Roundup Fellowship placement was optimal and that it would be in the interest of L.R.S. that she remain at that facility. On March 29, 1989, the district court ordered continuation of the placement at the Roundup Fellowship facility until L.R.S. turns twenty-one. The anticipated cost of this additional period of placement, beginning January 1, 1989, is $54,000.

The parents appealed the February 22 order, which imposed liability for the total cost of placement.[6] The court of appeals affirmed that order and held that the parents are required to reimburse the Department for the entire cost of L.R.S.'s placement. *People in the Interest of L.R.S.*, 791 P.2d at 1216. This ruling rested on a construction of the statutes defining parental obligations for child care costs incurred by state or county agencies.

## II.

■ Article 3 of the Colorado Children's Code, §§ 19–3–101 to –702, 8B C.R.S. (1990

Supp.), governs dependency and neglect proceedings. A child may be neglected or dependent because she lacks proper care through no fault of the parents. § 19–3–102(1)(e). In this case, the parents were unable to find suitable, affordable care for their developmentally disabled daughter. Because of their inability to provide L.R.S. with appropriate care, they agreed to a proceeding whereby L.R.S. was adjudicated a neglected or dependent child. Legal custody of L.R.S. was transferred to the Department, which then had the responsibility to provide L.R.S. with appropriate care and treatment. This adjudication procedure allows parents with limited financial ability to obtain proper treatment for their developmentally disabled children, and thereby furthers the legislative purpose of securing for such children the care that will best serve their welfare and the interests of society. § 19–1–102(1)(a); *cf.* § 27–10.5–101, 11B C.R.S. (1989) (a purpose of the statutes concerning care and treatment of the developmentally disabled is to provide appropriate programs for developmentally disabled persons regardless of their ages). The best interests of the child, rather than the parents' finances, determine what care the child receives.

Although this voluntary adjudication procedure vested legal custody of L.R.S. with the Department, the parents were not completely relieved of responsibility for her care and support. The Colorado Children's Code provides that when the court vests legal custody of a child with a publicly supported agency, the court must order the parent

> to pay a fee, based on the parent's ability to pay, to cover the costs of ... providing for residential care of the child. When custody of the child is given to the county department of social services, such fee for residential care shall be in accordance with the fee requirements as provided by rule of the department of

---

**5.** The amount of the monthly installments had been adjusted upward from $221 to reflect changes in the parents' financial status.

**6.** The Department does not seek reimbursement of costs incurred before January 1989.

social services, and such fee shall apply, to the extent unpaid, to the entire period of placement.

§ 19–1–115(4)(d), 8B C.R.S. (1990 Supp.). This section imposes an obligation on the parents to contribute towards the costs of their child's residential placement. This court-ordered fee applies to the entire period of placement, "from the date of admission into care, but not the day of discharge." Rule 7.802.711, 12 CCR 2509–9 (1988). The amount of this fee is based on the parents' ability to pay, and is calculated according to the formula contained in Rule 7.802.713, 12 CCR 2509–9 (1988). Thus, under section 19–1–115(4)(d), the parents pay a fee computed according to their ability to pay, in accordance with fee requirements established by rule, for the purpose of covering the costs of placement.[7]

Section 26–5–102, 11B C.R.S. (1989), concerning provision of child welfare services,[8] imposes a parental support obligation that complements section 19–1–115(4)(d). *See* § 26–5–103, 11B C.R.S. (1989). The state department of social services shall adopt rules and regulations to establish "a fee schedule based upon ability to pay, requiring those persons legally responsible for the child who are financially able as determined by the state department to pay for all or a portion of the services provided under this article." [9] As with section 19–1–115(4)(d), the parents' obligation is computed according to their ability to pay, and the purpose of the fee is to help pay the costs of child welfare services provided to qualifying children.

When the Department reviewed its parental reimbursement policy in October 1988, it decided that section 14–7–102, 6B C.R.S. (1987), also applies. That section creates an obligation of the parents to repay the entire cost of the support of their child committed under any law of this state to any state institution or to any private institution where the child is kept at the expense of the county or state. §§ 14–7–101, –102, 6B C.R.S. (1987). The county may recover

> such sum for care, support, and maintenance of the child as may be reasonable therefor, and in no case shall such sum be less than the per capita monthly or yearly amount of expense in the institution in which the child is confined or the actual expense incurred by the state or county for the care and maintenance of such child.

§ 14–7–102. This section requires parental reimbursement of the entire cost of placement, and does not condition the parents' obligation on their financial ability to pay.

### III.

#### A.

■ Determination of the parents' financial support obligation entails an analysis of these overlapping statutory provisions. When construing statutes, the court must determine and give effect to the intent of the legislature, *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991); *Estate of David v. Snelson*, 776 P.2d 813, 817 (Colo.1989), and adopt the statutory construction that best effectuates the purposes of the legislative scheme, *Smith v. Myron Stratton Home*, 676 P.2d 1196, 1199 (Colo.1984).

■ Sections 19–1–115(4)(d) and 26–5–102 impose financial responsibility upon the parents for their child's care but define that obligation in terms of the parents' ability to pay. These provisions reflect a legislative concern that prohibitive costs may deter parents from obtaining appropri-

---

**7.** The Department argues that "cover the costs" means "pay in full." The sentence structure, however, reveals that "cover the costs" describes the fee's purpose, while "ability to pay" governs its size.

**8.** " 'Child welfare services' means the provision of necessary shelter, sustenance, and guidance to or for children who are ... neglected or dependent." § 26–5–101, 11B C.R.S. (1989).

**9.** This fee schedule is contained in Rule 7.802.713, 12 CCR 2509–9 (1988). We express no opinion as to whether the rules, regulations and fee schedule promulgated by the state department of social services pursuant to § 26–5–102 may require parents to make fee payments after their child's placement terminates.

ate treatment. In recognition that placement costs may exceed the financial resources of many parents, these sections impose a fee for placement services but tie the amount of the fee to the parents' ability to pay. The "all or a portion" language contained in section 26–5–102 indicates that partial reimbursement is contemplated for parents who are financially unable to pay the entire cost of placement. Appropriate treatment and care become affordable for all families because the parents contribute only what they are able to pay; parents will be encouraged to obtain the care dictated by the best interests of their child.

By contrast, section 14–7–102 explicitly requires that the parents pay no less than the actual expense incurred by the county for the care and maintenance of their child. Even though legal custody of the child has been vested in the county department of social services, the parents retain financial responsibility for the support of that child. *See* § 14–7–101. This section, originally enacted in 1905, ch. 126, sec. 2, 1905 Colo. Sess.Laws 295, 295–96, expressly commands complete reimbursement, and embodies a legislative policy that the parents shoulder the entire financial burden of their child's placement.

### B.

These statutory provisions establish contradictory parental reimbursement obligations. The statutes contain conflicting statutory language: sections 19–1–115(4)(d) and 26–5–102 speak in terms of the parents' ability to pay while section 14–7–102 imposes absolute liability without regard for the parents' financial condition. Moreover, the provisions represent discordant legislative objectives. The policy of complete reimbursement does not further the legislative intent of making treatment available and affordable to families of reduced means. These incompatibilities in both statutory language and legislative policy produce an irreconcilable conflict between the statutes.

The Department proposes a statutory construction to harmonize these provisions. The Department argues that section 14–7–102 delineates the total amount of the parents' obligation while sections 19–1–115(4)(d) and 26–5–102 define only the size of the monthly payment. Under this construction, the parents in the present case must repay the costs of the entire period of placement—estimated to be $54,000—in $264 monthly installments. These monthly payments would continue, even after the child's three year placement ends, for over seventeen years. This interpretation, the Department asserts, resolves the statutory conflict.

■ We disagree with the Department's proposed interpretation. First, this statutory construction ignores the "all or a portion" language contained in section 26–5–102. This language clearly indicates that partial reimbursement is contemplated for parents of limited means. Second, the term "ability to pay," found in both sections 19–1–115(4)(d) and 26–5–102, denotes that the parents should pay only the portion of the total cost that they can afford.[10] The Department's insistence on complete reimbursement ignores this plain denotation. Statutory terms, however, should be given their common, ordinary meaning, *Thiret v. Kautzky,* 792 P.2d 801, 806 (Colo. 1990), and that commonly accepted meaning is preferred over strained or forced interpretations, *State v. Hartsough,* 790 P.2d 836, 838 (Colo.1990). The express statutory language does not support the Department's construction.

In addition, the Department's policy of full reimbursement thwarts the legislative intention to impose a smaller financial burden on parents of reduced means. Since poorer parents will make smaller payments, they must bear the financial burden longer than well-to-do parents. Imposing a seventeen-year obligation for a three-year placement does not comport with the concept of limiting liability based on "ability to pay." The Department admitted in oral

---

**10.** We also note that prior to its 1988 policy review, the Department interpreted sections 19–

1–115(4)(d) and 26–5–102 in this fashion.

argument that its interpretation could result in a fifty-year responsibility and claims against the parents' estates. These harsh consequences exacerbate, not alleviate, the financial strain on poorer parents. The Department's construction reconciles the statutes by disregarding the legislative purposes underlying sections 19–1–115(4)(d) and 26–5–102.

### C.

■ When several statutes concern the same subject matter, we attempt to read them together and reconcile them, if possible, so as to give effect to each statute. *State Dept. of Revenue v. Borquez*, 751 P.2d 639, 643 (Colo.1988). In this case, the statutes present an irreconcilable conflict, so no such reading can be adopted. Section 14–7–102 was enacted in 1905, while the other sections were enacted significantly later and therefore prevail. § 2–4–206, 1B C.R.S. (1980); *City of Littleton v. Board of County Comm'rs*, 787 P.2d 158, 162 (Colo.1990); *Public Employees Retirement Ass'n v. Nichols*, 200 Colo. 328, 330, 615 P.2d 657, 658 (1980). Section 19–1–115(4)(d) belongs to a comprehensive statutory scheme governing dependency and neglect adjudications. Sections 19–1–115(4)(d) and 26–5–102 are specific provisions concerning dependency and neglect adjudications, while 14–7–102 is a general provision governing the parental support obligation. Specific provisions control over general provisions. § 2–4–205, 1B C.R.S. (1980); *Maurer v. Young Life*, 779 P.2d 1317, 1322 & n. 6 (Colo.1989). Under these canons of statutory construction, section 14–7–102 must give way.

This statutory construction enables parents of limited means to obtain appropriate treatment and care for their children, a major objective of the dependency and neglect adjudication procedure. While the parents must contribute towards the cost of their child's placement, they are required to contribute only what they can afford. This policy parallels the parental contribution requirements in other pro-

grams for the mentally ill and developmentally disabled. *See, e.g.,* §§ 27–12–101(1), –103, 11B C.R.S. (1989) (commitment of persons to public institutions for the treatment of the mentally ill or mentally deficient).[11] The legislative intent has been to encourage parents to obtain treatment for their children by limiting the parents' financial obligation to the amount they can afford to pay.

The Department's interpretation would impose a long-term financial burden that will discourage parents from seeking appropriate care for their developmentally disabled children. Many families cannot afford the high cost of residential care; the voluntary adjudication procedure is designed to enable parents of limited means to obtain proper care and treatment for their children. The prospect of a long term, even lifetime, financial burden may dissuade parents from seeking appropriate care, thereby undercutting the goals of the voluntary adjudication procedure. In this case, the expense of one year's treatment will result in over five years of payments by the parents; this situation presents enormous pressure to delay seeking appropriate care because such delay will prevent the accumulation of large financial obligations. Alternatively, parents may feel pressure to seek the least expensive care possible, rather than the treatment that would best serve the needs of their child. Financial considerations, rather than the best interests of the child, predictably will dictate the choice of treatment for developmentally disabled children in some cases. The statutory construction proposed by the Department will result in some developmentally disabled children not receiving appropriate care. Such consequences are contrary to both the language and the policy of the controlling legislation.

### IV.

In the alternative, the Department argues that the trial court had discretion to order the parents to pay the entire cost of placement. The state department of social services rules allow the district court to

---

**11.** The term "mentally deficient person" is "deemed to mean and be included with the term

'person with developmental disabilities.'" § 27–10.5–135(2), 11B C.R.S. (1989).

examine extraordinary expenses and adjust the support fee. Rule 7.802.712, 12 CCR 2509–9 (1988).[12] Such court mandated fees will override the departmental guidelines. *Id.* Since the district court decided that the parents must pay the entire cost of placement, the Department argues that this court should defer to the district court's discretion.

 The February 12 order, however, was not an exercise of judicial discretion. The order that the parents pay the entire cost of placement was based upon the district court's interpretation of sections 14–7–102, 19–1–115(4)(d), and 26–5–102. The court addressed only the question of statutory construction, and did not evaluate whether it should charge the parents for the entire cost of placement.[13] Since the court's order relied solely on its statutory interpretation, a reviewing court need not defer to the trial court's decision.

We reverse the judgment of the Colorado Court of Appeals and return the case to that court with directions to remand to the district court for further proceedings consistent with this opinion.

---

**12.** Rule 7.802.712, 12 CCR 2509–9 (1988), provides:

> A fee shall be collected from the legally responsible custodial parent(s) in accordance with the fee schedule or with the fee ordered by the court. Any extraordinary expenses must be presented to and adjusted by the court. The court order takes precedence.

**13.** We do not address the extent of the court's discretion in adjusting for extraordinary expenses under Rule 7.802.712.