**Glen LEFFLER, d/b/a Skyline Sod, and Pinnacol Assurance, Petitioners,**

v.

**INDUSTRIAL CLAIM APPEALS OF-FICE of the State of Colorado and Daniel Lewis, Respondents.**

**No. 09CA2299.**

Colorado Court of Appeals, Div. III.

Aug. 19, 2010.

Harvey D. Flewelling, Denver, Colorado, for Petitioners.

No Appearance for Respondent Industrial Claim Appeals Office.

Michael D. Mullison, Greeley, Colorado, for Respondent Daniel Lewis.

Opinion by Judge ROY.

Glen Leffler, doing business as Skyline Sod, and his insurer, Pinnacol Assurance (collectively employer), appeal an order of the Industrial Claim Appeals Office of Colorado (Panel) awarding Daniel Lewis (claimant) $4800 pursuant to section 8–42–108(2)(c), C.R.S.2009, for additional compensation based on a disfigurement from his partial loss of two fingers.

The sole issue is whether the stump of a partially amputated finger is a disfigurement within the meaning of section 8–42–108(2)(c), which provides for a disfigurement award of up to $8000 for "[s]tumps due to loss or partial loss of limbs." We conclude that it does and affirm the award.

## I. Background

Claimant sustained an admitted injury in 2008 when his right hand was caught in a sod harvesting machine. The administrative law judge (ALJ) found that "[c]laimant suffered traumatic amputation of the right index finger at the distal interphalangeal joint and of the right long finger at the proximal interphalangeal joint." After concluding that claimant was disfigured from the resulting

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2009.

"[s]tumps due to loss or partial loss of limbs," the ALJ awarded claimant $4800 as "additional compensation under [s]ection 8–42–108(2)(c)."

The Panel, rejecting employer's argument that section 8–42–108(2)(c) is limited to upper extremity stumps resulting from amputations above the wrist, affirmed.

## II.  Applicable Law and Standard of Review

■  Statutory construction is a question of law we review de novo.  Our primary objective in construing a statute is to effectuate the intent of the General Assembly. . . . We also review an administrative agency's conclusions of law de novo. . . . [W]e traditionally give deference to the interpretation of a statute adopted by the officer or agency charged with its administration. . . .

The General Assembly explicitly stated its intent that the purpose of the Workers' Compensation Act is to provide an effective remedy for employees injured at work. . . . To effectuate its remedial and beneficent purposes, we must liberally construe the Act in favor of the injured employee.

*Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397–98 (Colo.2010) (citations omitted).

## III.  What is a "Limb"

■  We begin by observing that the terms "arm," "limb," and "upper extremity" are virtually interchangeable in the literature. The word "limb" is not defined in the Workers' Compensation Act (Act).  *Webster's Third New International Dictionary* 1311 (2002) defines "limb" as the "leg or arm of a human being."  *See also City of Thornton v. Replogle*, 888 P.2d 782, 785 (Colo.1995) (summarizing scheduled injuries—which include loss of eyes, ears, arms, and legs—as "blindness, deafness, or loss of a limb").  Conversely, an arm is commonly understood to be a "limb."  *See, e.g., H & H Warehouse v. Vicory*, 805 P.2d 1167, 1169 (Colo.App.1990) (describing an "arm" as a "limb").  The *American Medical Association Guides to the Evaluation of Permanent Impairment* (3d ed.1991) has been adopted as the guideline

for determining "impairment ratings as a percent of the whole person or affected body part."  § 8–42–101(3.5)(a)(II), C.R.S.2009. That publication defines "upper extremity," as follows:

> The upper extremity, the lower extremity, the spine, and the pelvis each is to be considered a unit of the whole person. The upper extremity has four parts: hand, wrist, elbow, and shoulder.  The normal hand has five digits: the thumb and the index, middle, ring, and little fingers.  The thumb has three joints: the interphalangeal (IP), metacarpophalangeal (MP), and the carpometacarpal (CMC) joints.  Each finger has three joints: the distal interphalangeal (DIP), the proximal interphalangeal (PIP), and metacarpophalangeal (MP) joints.

*American Medical Association Guides* § 3.0, at 11.

A "stump" is "the basal portion of a limb or other part of the body remaining after the rest of it is removed."  *Webster's Third New International Dictionary* 2269; *see Reynolds v. Indus. Claim Appeals Office*, 794 P.2d 1080, 1081–82 (Colo.App.1990) (using "amputated stump" to refer to the portion remaining after the "amputation of the lower leg and foot").

Application of these plain and ordinary definitions, by themselves, is sufficient to support the conclusion that fingers are the distal extensions of the upper limb and the stumps of fingers are "stumps" within the meaning of section 8–42–108(2)(c).  This conclusion is consistent with our duty to liberally construe the Act. *See Specialty Rests. Corp.*, 231 P.3d at 397–98.

Further support for our conclusion can be found in cases in which the language of the Act has been interpreted broadly when another section of the Act on a similar subject evinces the General Assembly's ability to make finer distinctions.  *See Replogle*, 888 P.2d at 786 ("[H]ad the legislature intended to impose the twelve-week limitation on both temporary and permanent disability benefits resulting from mental impairment, it could have done so expressly in the 1991 amendment as it did in another context."); *City of*

*Loveland Police Dep't v. Indus. Claim Appeals Office,* 141 P.3d 943, 954–55 (Colo.App. 2006) ("The legislature has been explicit in imposing limitations on death benefits. If it intended to limit death benefits where the death results from mental impairment, we conclude it would have done so expressly." (citations omitted)); *Colo. Springs Disposal v. Indus. Claim Appeals Office,* 58 P.3d 1061, 1063 (Colo.App.2002) (given that "the General Assembly is perfectly capable of drawing a distinction between modified employment and regular employment," "if the General Assembly had intended to exclude nonmodified employment factual circumstances from the reach of the termination statutes, it certainly could have tailored the statutes accordingly"); *see also Indus. Claim Appeals Office v. Ray,* 145 P.3d 661, 668 (Colo.2006) (giving effect to "[t]he legislature's choice of broadly inclusive language").

Such is the case here. For purposes of calculating impairment benefits, the General Assembly has proven quite adept at making extremely fine distinctions as to the location of amputations. *See* § 8–42–107(2), (5), (7)(a), (8)(c.5), C.R.S.2009 (distinguishing among different joints, bones, and locations on a limb for purposes of awarding benefits for the loss or amputation of arms and legs). The fact that it opted to make no comparable distinctions for purposes of disfigurement benefits supports a conclusion that the more general and expansive language in section 8–42–108(2)(c) is intentional.

Accordingly, we agree with the Panel that section 8–42–108(2)(c) applies to the stumps of fingers, and that the ALJ therefore did not err in awarding claimant disfigurement benefits.

The order of the Panel is affirmed.

Judge ROMÁN and Judge BOORAS concur.